## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| HUDSON-RPM DISTRIBUTORS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | **NO. 19-40095-TSH** |
| | ) | |
| BOWDITCH & DEWEY, LLP, | ) | |
| DAVID P. GROSSI, and | ) | |
| TERRENCE J. BRIGGS, | ) | |
| | ) | |
| Defendants/Third-Party Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARCUM, LLP, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |
| | ) | |

## Report and Recommendation

**November 23, 2022**

Hennessy, M.J.

Plaintiff Hudson-RPM Distributors, LLC ("Hudson") brought suit against Defendants and Third-Party Plaintiffs Bowditch & Dewey, LLP ("Bowditch") alleging legal malpractice. Bowditch, in turn, brought suit against Third-Party Defendants Marcum, LLP ("Marcum") for contribution.  Before this Court are two motions for summary judgment: the first brought by Bowditch with respect to Hudson's legal malpractice claim, and the second by Marcum with respect to Bowditch's contribution claim.  Hudson has filed an opposition to Bowditch's motion, and Bowditch has filed an opposition to Marcum's motion.  These motions have been referred to

1

the undersigned and are now ripe for adjudication.  [Dkt. No. 106].  For the reasons that follow, the undersigned recommends that Bowditch's Motion [Dkt. No. 219] be DENIED and Marcum's Motion [Dkt. No. 216] be GRANTED.

## I.    BACKGROUND

Hudson, a distributor of magazines, books, and other consumer products, is a limited liability company based in New Hampshire.  [Dkt. No. 1 ¶ 2].  In 2013, Hudson sought legal advice from Bowditch concerning Hudson's financial obligation to the New England Teamsters and Trucking Industry Pension Fund (the "Fund").  [Id. ¶¶ 15-16].  Specifically, Hudson sought to reduce its workforce without incurring withdrawal liability under the Employee Retirement Income Security Act ("ERISA").[1]  [Id. ¶¶ 17, 19].  On November 1, 2013, Hudson's representative met with Bowditch attorneys David P. Grossi and Terrence J. Briggs and they discussed Hudson's obligation to the Fund.  [Id. ¶ 20].  In reliance on Bowditch's advice, Hudson created a spreadsheet to help it reduce its workforce without triggering withdrawal liability.[2]  [Dkt. No. 1 ¶ 21].

Hudson hired Marcum, an accounting firm, to conduct audits of Hudson's financial statements for the fiscal years ending in December 2012, December 2013, December 2014,

---

[1] ERISA creates a statutory liability for employers that withdraw from an underfunded multiemployer pension plan equaling "its proportionate share of the pension fund's vested but unfunded benefits."  29 U.S.C.A. § 1381; Groden v. Reichert & Son Trucking, Inc., No. 16-CV-10378, 2018 WL 1326389, at *1 (D. Mass. Mar. 15, 2018).  Withdrawal liability may be triggered by either a partial or a complete withdrawal of pension funds.  See Giroux Bros. Transp. v. New England Teamsters & Trucking Indus. Pension Fund, 73 F.3d 1, 3 (1st Cir. 1996) (noting that the Fund must assess liability after either complete or partial withdrawal).  Hudson attempted to reduce the number of its employees for which Hudson had a pension fund contribution obligation without triggering withdrawal liability.  [Dkt. No. 1 ¶¶ 17-18].

[2] An employer's payments into a pension fund under ERISA are referred to as "contribution base units" or "CBUs." See 29 U.S.C.A. § 1381(a)(11) (defining "contribution base unit" as "a unit with respect to which an employer has an obligation to contribute under a multiemployer plan.").  CBUs represent an employer's pension contributions made to a pension fund on behalf of its employees.  See, e.g., Giroux Bros. Transp., 73 F.3d at 2.  A partial withdrawal is triggered when there is a 70% decline in contributions to the pension fund within a certain timeframe defined in the statute, or when there is a partial cessation of the employer's contribution obligation to a plan on the last day of a plan year.  29 U.S.C.A. § 1385(a).

January 2016, January 2017, and December 2017.  [Dkt. No. 218 ¶ 28].  Hudson and Marcum executed engagement letters for each of the six audits Marcum conducted.  [Id. at ¶ 35].

On March 28, 2019, the Fund notified Hudson that the reductions it had made in its workforce during 2015 through 2017 had triggered withdrawal liability.  [Dkt. No. 1 ¶ 26].  The Fund calculated Hudson's withdrawal liability to be $19,948,714 for the fiscal years 2015, 2016, and 2017.  [Dkt. No. 1 ¶¶ 28, 33].  Hudson filed its Complaint in July 2019 alleging that Bowditch,[3] its former counsel, failed to inform Hudson in 2013 that the formula Hudson used to reduce its workforce without triggering withdrawal liability was incorrect and resulted in the $19.9 million fine.  [Id. ¶¶ 24, 26-28, 30, 33].  Bowditch answered and asserted a third-party complaint against Marcum for contribution in the event Bowditch should be held liable to Hudson.[4]  [Dkt. No. 8]. On May 27, 2021, Hudson filed an Amended Complaint claiming the $19M assessment as the sum of its damages, removing any purportedly related losses sustained in 2018 onward.  [Dkt. No. 192 ¶ 10].

## II.    STANDARD

"The objective of summary judgment is 'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'"  Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico, 394 F.3d 40, 42 (1st Cir. 2005) (quoting Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992)).  When considering a motion for summary judgment, "the court shall grant summary judgment if the

---

[3] Bowditch partners Terrence J. Briggs and David P. Grossi are also defendants.  Attorney Grossi died on March 13, 2022; Defendants' counsel filed a Suggestion of Death on March 23, 2022.  [Dkt. Nos. 212, 227 n.1].  Defendants' counsel does not represent Grossi's estate.  [Dkt. No. 227 n.1].

[4] Earlier in this litigation, Bowditch had impleaded law firm Littler Mendelson, P.C. ("Littler") for contribution toward any damages Hudson might have sought beyond the $19.9M liability.  [Dkt. No. 90].  Emphasizing that Littler had not been retained until after the partial withdrawal liability had been imposed, and finding any extraneous damages too speculative, the undersigned granted Littler's motion to dismiss on October 21, 2020.  [Dkt. No. 127].

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue is "genuine" when the evidence is such that a reasonable factfinder could resolve the point in favor of the nonmoving party.  Morris v. Gov't Dev. Bank of Puerto Rico, 27 F.3d 746, 748 (1st Cir. 1994).  A fact is "material" when it might affect the outcome of the suit under the applicable law.  Id.

The moving party bears the initial burden of asserting the absence of a genuine issue of material fact and must "support that assertion by affidavits, admissions, or other materials of evidentiary quality."  Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003).  In determining whether summary judgment is proper, "a court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor."  Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir. 2006).  Summary judgment is "mandate[d] … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Flanders & Medeiros, Inc. v. Bogosian, 65 F.3d 198, 206 (1st Cir. 1995) (affirming summary judgment in favor of the defendant in a legal malpractice case where the plaintiff failed to provide any expert testimony as to defendants' standard of care and breach).

## III.    ANALYSIS

### A.  Hudson's Legal Malpractice Claim Against Bowditch

"Under Massachusetts law, the elements of a claim for legal malpractice are: (1) the attorney failed to exercise reasonable care and skill in handling the matter for which he was retained; (2) the client incurred a loss; and (3) the attorney's negligence is the proximate cause of

the loss." Max-Planck-Gesellschaft Zur Foerderung Der Wissenschaften E.V. v. Wolf Greenfield & Sacks, PC, 661 F. Supp. 2d 125, 128 (D. Mass. 2009).

Bowditch argues that summary judgment is warranted in its favor as Hudson has continually failed to provide "a causation analysis or a damage calculation" over the course of discovery.   [Dkt. No. 220 at p. 6].   Bowditch contends that "none of Hudson's expert disclosures[,]" including two expert reports prepared by Jeffrey Pasek ("Pasek"), clearly state whether "an alternative course of action was feasible … and what the cost would have been" had Bowditch advised Hudson differently regarding the risk of withdrawal liability.   [Id. at pp. 1-2, 6]. Throughout its summary judgment submissions, Bowditch also denies it was negligent in advising Hudson, but fails to meaningfully address this denial, focusing instead on the alleged insufficiency of Hudson's evidentiary showing on damages and causation.

### 1.    Damages

Whether damages and causation are treated as a single element or separately, "the substance is the same: the plaintiff must show that the defendant's allegedly tortious conduct put the plaintiff in a worse position than he would have been in but for the misdeed." Bos. Prop. Exch. Transfer Co. v. Iantosca, 720 F.3d 1, 10 (1st Cir. 2013).  To sustain a legal malpractice claim, a plaintiff must substantiate his or her "worse position" by pleading actual damages and cannot recover for damages that are merely speculative.  Levin v. Berley, 728 F.2d 551, 553-54 (1st Cir. 1984); Berman v. Alexander, 57 Mass. App. Ct. 181, 188 (2003).  Such actual damages "express[] in dollars and cents the injury sustained by a plaintiff." Donovan v. Philip Morris USA, Inc., 455 Mass. 215, 222 (Mass. 2009).  Moreover, "the fundamental purpose of such damages is to compensate a plaintiff, not punish a defendant." Moores v. Greenberg, 834 F.2d 1105, 1111 (1st Cir. 1987) (citing Cordeco Dev. Co. v. Santiago Vasquez, 539 F.2d 256, 262 (1st Cir. 1976)).

Lastly, "[p]roof of damages by mathematical certainty is not a prerequisite for recovery." Brooks v. Connor, 2006 Mass. App. Div. 13 (Dist. Ct. 2006) (citing Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 777 (1986)).

The Parties dispute the specificity with which a plaintiff's *net* loss must be proffered to survive a motion for summary judgment. According to Bowditch, Hudson's failure to provide a more precisely measured "avoidance cost" Hudson would have allegedly incurred instead of the $19.9M liability amounts to a failure to adequately plead the damages element of its malpractice claim. Bowditch contends that the burden to provide that sum is on Hudson, and that without it, a jury cannot reasonably determine Hudson's actual damages, or net loss.

Hudson, in turn, avers that the exact sum of an avoidance cost is for a jury to decide after being presented alternative options Hudson might have pursued to avoid triggering withdrawal liability. Hudson emphasizes that Pasek's second expert report was explicitly prepared to rebut Bowditch's experts' estimation that any viable alternative to triggering the liability would have cost Hudson an amount comparable to $19.9M. [See Pasek Depo., Dkt. No. 221-10 at 23 ("When I got the Cislo and Johnson report in which they went into great detail on the amount of the financial harm, I went back and relooked at the data with a focus on trying to quantify to some degree the financial harm to show the fallacies in what – the Johnson and Cislo report contained.")]. Hudson also disputes the fact that an avoidance cost of some amount would have been necessary to forestall or escape the Fund's $19.9M assessment, arguing in its sur-reply that "[n]ot all of the[] measures [indicated in Pasek's expert report] would have caused [Hudson] to incur additional expense." [Dkt. No. 245 at p. 2].

### a. Hudson's Claimed Losses

The topic of Hudson's damages calculation has been ventilated by the Parties and this Court over the course of discovery, most recently pursuant to Bowditch's November 3, 2021 motion to strike Hudson's supplemental written discovery responses.  [See Dkt. Nos. 205, 206, 209, 214].  To briefly retrace those exchanges, Bowditch served its first set of interrogatories on September 25, 2019.  [Dkt. No. 205-1].  That first set included interrogatory number 22 ("Rog. 22"), which reads:

> Please itemize and describe with specificity all damages allegedly incurred from the actions and/or omissions alleged in the Complaint, detailing the amount of damage allegedly incurred, the name of the individual who calculated the amount of damages, the method of calculation used to determine the alleged damages, and an explanation of how the damage calculation was completed.

[Id. at p. 6].  Hudson served its Rule 26(a) initial disclosures, including an initial computation of damages under Section 3, on December 20, 2019.  [Dkt. No. 205-3].  Hudson disclosed as follows: "Defendants are liable for the full amount of the withdrawal liability in the total sum of not less than $19,948,714, as well as fees and costs paid to [Defendants], and other fees and costs incurred as a result of [Defendants'] negligence."  [Id. at p. 5].  Hudson noted that it would "supplement" its disclosure "with a detailed computation of its damages upon the completion of discovery and its own investigation."  [Id.].  Hudson later objected to Rog. 22 on February 27, 2020, stating that it had "not yet ascertained the full extent of damages it may have suffered, which damages are ongoing[,]" and reserved "the right to produce additional information responsive to [Rog. 22] as the case progresses, including pursuant to the procedures for expert discovery in this case."  [Dkt. No. 205-2 at pp. 20–21].

On April 23, 2020, Bowditch moved to compel Hudson "to supplement its answer to Section 3 of its Initial Disclosure[.]"  [Dkt. No. 36 at p. 1].  Hudson opposed that motion, stating that "the measure of Plaintiff's damages does not require a complicated damages calculation as it

might in a lost profit damages or similar type claim." [Dkt. No. 41 at p. 13]. Hudson maintained that its damages "are specifically spelled out in the Fund's partial withdrawal liability assessment" and that "[n]o additional calculations or modifications are required to comply" with Fed. R. Civ. P. 26(a). [Id.]. Bowditch filed a reply on May 12, 2020, arguing—as they do in the instant motion—that they were unable to calculate "the difference between the $19[.9] million withdrawal liability assessed by the Pension Fund and the additional costs required to avoid it." [Dkt. No. 53 at pp. 1–2 (emphasis in original)]. In a sur-reply filed on May 15, 2020, Hudson insisted that it "disclosed" its "damages to date," which encompassed "the partial withdrawal liability assessment imposed by the Fund plus the fees and costs to Bowditch." [Dkt. No. 54 at p. 1]. The undersigned held a hearing on Bowditch's motion to compel on July 9, 2020 and denied the motion on July 10. [Dkt. Nos. 87, 88].

Hudson did not supplement its responses to Rog. 22 until September 13, 2021. [See Dkt. No. 205 at p. 3]. In its supplemental response, Hudson itemized five categories of damages: (1) the withdrawal liability for the year 2017 plus interest on that liability, which Hudson resolved through a settlement payment; (2) interest on the loans Hudson took to finance that settlement payment; (3) the fees Hudson paid Bowditch for the allegedly negligent work they performed; (4) additional fees Hudson incurred in addressing and resolving withdrawal liability, including fees for new counsel in other, unrelated matters; and (5) attorney's fees Hudson incurred in pursuing this malpractice action. [See Dkt. No. 205-4 at pp. 3–4].

In November 2021, Bowditch moved to strike portions of Hudson's supplemental response. [Dkt. No. 204]. However, in its motion to strike, Bowditch did not "appear to challenge th[e] category of damages" relating to withdrawal liability to the Fund, plus interest. [Dkt. No. 214 at p. 7]. This Court thus refrained from striking information concerning those damages, seeing

no objection.  [Id.].  This Court also denied Bowditch's motion for the Court to "issue an order" that Hudson "not be allowed to argue its entitlement" to supplemental damages "at trial."  [Dkt. No. 204 at p. 2].  As provided in the Order, "Rule 37(c)(1) does not grant this Court the authority to dictate what damages Hudson can seek at trial, it states only that the breaching party 'is not allowed to use [the untimely] information or witness to supply evidence on a motion, at a hearing, or at a trial[.]'"  [Dkt. No. 213 at pp. 13-14].

In sum, Hudson has repeatedly pointed to the face value of the Fund's assessment as its measure of damages.  While it has previously attempted to augment that baseline with related losses, Hudson is maintaining its initial position that the roughly $19.9M sum represents the totality of its losses for the purposes of responding to the instant motion for summary judgment.

### b.  The Parties' Expert Reports

The elements of Hudson's legal malpractice claim, including causation and damages, have more recently been assessed by experts retained by both Parties.  Those conclusions are briefly summarized below.

### i.      Hudson's First Expert Report by Pasek

Pasek's initial expert report dated August 14, 2021 [Dkt. No. 221-9] was primarily prepared to "provide … [Pasek's] opinion regarding whether [Bowditch] and its attorneys were negligent or otherwise violated the governing standard of care they owed to Hudson[] related to the assessment of a partial withdrawal liability[.]"  [Id. at p. 2].  Under "Summary of Opinions[,]" Pasek concluded that Bowditch "[d]id not take steps to effectively limit their representation of Hudson[] to advising whether the company had already incurred a partial withdrawal … and [f]ailed to exercise the degree of skill, care, and diligence employed by the average qualified attorney providing comparable legal services[.]"  [Id. at p. 5].  Further, "[a]s a result, Hudson[]

suffered foreseeable, but unnecessary financial harm when it was assessed a partial withdrawal liability[.]" [Id.].

The majority of Pasek's first assessment, as noted by Bowditch, focuses on Hudson and Bowditch's attorney-client relationship, the scope of Bowditch's representation of Hudson with regard to Hudson's ERISA compliance, and Bowditch's omissions in advising Hudson of its exposure to withdrawal liability.   In support of that assessment, Pasek highlights several communications between Briggs, Grossi and Ben Walter ("Walter"), an employee of Hudson,[5] between 2009 and 2015 on the subject of work force reductions, specifically Hudson's request for "forward-looking guidance on the likelihood of triggering a future partial withdrawal." [Id. at 15].

After reciting the elements of a legal malpractice claim under Massachusetts law [id. at p. 22] Pasek's report goes on to conclude that "the harm Hudson[] suffered as a result of the Defendant attorneys' malpractice was not inevitable and could have been prevented." [Id. at 30]. Pasek first identified the components of the Fund's assessment, indicating its "demand for payment of partial withdrawal liability in the amount of $19,948,714 based on a partial withdrawal for the plan year ended September 30, 2017.   Hudson[] made required monthly payments of $218,944 between May 25, 2019 and December 25, 2020, with a lump sum payment of $17,934,832 on or about December 31, 2020." [Id. at p. 30].

Pasek goes on to indicate that:

> For the purpose of [his] inquiry [he] [is] not particularly concerned about the amount or other terms of that settlement. The issue is whether the company would have incurred any liability to the Pension Fund or whether it could have reduced that liability if the Attorney Defendants had exercised the same degree of skill, care, and diligence employed by the average qualified attorney providing

---

[5] Ben Walter worked as Hudson's Payroll Manager during the time in question, from 2000 to 2015; in 2015, he was promoted to Human Resources Manager.   [Dkt. No. 218-4 at p. 4].

comparable legal services at the time in advising clients about their obligations and exposure to partial withdrawal liability.

[Id.].  Pasek further notes that:

> Had Hudson[] been armed with the correct information for how to calculate the trigger for partial withdrawal, there were numerous steps the company could have taken to eliminate the risk of incurring any withdrawal liability. [He] [has] not been asked to identify all of the actions the company might have taken, but a qualified attorney providing Labor/ERISA services concerning multiemployer withdrawal liability issues could have guided the company through that process.

> The point is that the assessment of a partial withdrawal was not inevitable. … If the company was willing to add CBUs for two or three additional union employees as shown in this exhibit, we have to assume that it would have been willing to add the same number of employees when operating under the correct calculations. A full-time employee working 40 hours a week for 52 weeks a year will work a total of 2,080 hours to three full-time employees may have added up to 6,240 more CBUs. Half of that number would have been more than sufficient to keep Hudson[] above the threshold for triggering a partial withdrawal in 2016.

[Id. at 31].

### ii.    Bowditch's Expert Reports

The first expert report provided by Bowditch was submitted by Hon. Mitchell Kaplan (Ret.) on September 21, 2021.  [Dkt. No. 221-11].  The report was prepared for Bowditch in response to Pasek's first report regarding Bowditch, Briggs, and Grossi's standard of care.  [Id. at p. 4].  As a general matter, the report concludes that Bowditch's failure to "provide additional information or advice to Hudson in 2013 is not an issue of expert opinion[,]" and should instead be weighed by triers of fact considering "the materiality of such advice to a reasonable person in this specific instance[.]"  [Id. at p. 4].  Kaplan provided a summary of the facts, which included the opinion of Pasek that "Hudson's withdrawal liability was triggered in 2016 and allegedly could have been avoided by actions taken by Hudson in 2016.  Hudson did not request, and Bowditch did not

provide, any advice about partial withdrawal liability in 2016." [Id. at p. 9]. Based on that understanding, Kaplan concludes the standard of care owed by Bowditch from 2013 to 2016 "presents a straightforward question of fact well within the capability of jurors to resolve based on their experience and common sense and not one that is amenable to the expert opinion of an ERISA expert." [Id. at p. 7]. Kaplan also suggests that "the ultimate question of whether Bowditch was negligent … and what was reasonably foreseeable to Bowditch are questions of fact not properly the subject of expert witness testimony." [Id.]. Thus, Kaplan's report does not touch on the merits of Hudson's claims regarding damages or causation, or any absence of such information in Pasek's report. Instead, it argues against the need for expert testimony as to the standard of care and causation elements of Hudson's legal malpractice claim.

The second expert report provided by Bowditch, dated September 13, 2021 and prepared by Stewart Putnam,[6] focused instead on "assess[ing] and opin[ing] on Hudson's management practices leading up to the assessment of the partial withdrawal liability." [Id. at p. 13]. Putnam concludes that "Hudson and its parent company failed to meet the standard of care under the circumstances and that its failures caused the losses it seeks in this litigation[,]" rather than any failure of Bowditch's. [Id.]. Putnam bases his conclusion largely on the fact that Bowditch initially provided Hudson an accurate formula to calculate partial withdrawal liability, Hudson allegedly did not request that Bowditch analyze its calculations in 2014 or later, and allegedly no one at Hudson double-checked Walter's spreadsheet. [Id. at p. 15]. Putnam concludes that where "potential liability is knowable, calculable, and able to be mitigated by a corporation, a reasonable management team will employ ordinary, basic management principles to avoid triggering it, defer it, or, at a minimum, not be surprised by it." [Id. at p. 17].

---

[6] Putnam is a consultant focused on "leadership development, executive coaching, business strategy, and focus group facilitation[.]" [Id. at p. 13].

The third and last of Bowditch's expert reports, dated September 23, 2021, was prepared by Ben Johnson, a retirement and pension actuary consultant, and Ryan Cislo, a CPA with experience in auditing and fraud examinations ("Johnson and Cislo" or "J&C").  [Dkt. No. 221-13].  The J&C report largely focuses on discrediting Pasek's first report, which Johnson and Cislo maintain "understates the costs associated with deferring a payment of the [partial withdrawal liability] by millions of dollars and ignores the substantial risk of a potential withdrawal liability increasing during a period of deferral."  [Id. at p. 5].  Specifically, Johnson and Cislo argue that Pasek's conclusion "that it would be advantageous to delay the [partial withdrawal liability] for as long as possible[,]" ignores significant labor and burden costs associated with maintaining Hudson's union headcount, which, according to their calculations, would have ranged from $4M to $14.4M through the end of 2021.  [Id. at pp. 7-8].  According to their own projections "utiliz[ing] readily available data regarding Hudson's CBUs during the Base Period for 2015 … and 2016[,]" rather than an estimate for those periods based on 2017 numbers as they allege Pasek did, Johnson and Cislo "determined Hudson would have had to increase its union headcount by 26 employees in 2016 to avoid a [partial withdrawal liability]."  [Id. at p. 8].  The J&C report further argues that the sum of a potential partial or complete withdrawal liability would likely increase over time, contrary to the view that delaying the cost would have been advantageous.  [Id. at p. 10].

### iii.    Pasek's Second Expert Report

Pasek's second report [Dkt. No. 221-12] focuses on assessing and rebutting Johnson & Cislo's report and putting forth Pasek's own damages calculation.  [See id. at 13-29].  First, Pasek describes the methodology he applied using "CBU data the Pension Fund provided" from 2009 to 2019 to estimate that Hudson "had triggered a partial withdrawal in 2016 by narrowly missing the required threshold in 2014, the first year of the 3-year test period."  [Id. at p. 18].  Pasek also

"estimated that the company would have needed an additional 2,526.5 hours to have surpassed the threshold[.]" [Id.]. Echoing an estimate he noted in his first report, Pasek indicated that he "would typically use 2,080 hours as equivalent to a full-time employee for the year … [and] estimated that the company had proceeded a little too rapidly in reducing its workforce and would have brought its CBUs above the threshold if it had not laid off two full[-]time employees or had hired two new full-time employees or their equivalent." [Id.].

Rebuffing J&C's conclusion that Hudson would have had to increase its union headcount by 26 employees in 2016 to avoid the Fund's 2017 assessment, Pasek provides two "lower cost and safer alternative[s] … available based on the fact that an employer will trigger a partial withdrawal only if it experiences a 70% decline for each year of the 3-year test period." [Id. at pp. 19-20]. Pasek describes his first proposed alternative as a "minimal employment option," by which Hudson "could simply have laid off or allowed a reduction through attrition of fewer workers than it did." [Id.]. Pasek specifies that reducing Hudson's union headcount "by ten fewer employees in 2014 than it did … [and] ke[eping] the same number of employees in 2015" would have meant Hudson could have added "CBUs for the equivalent of less than five additional employees, none of whom would have been required to be retained in [2016]." [Id.]. That option, in Pasek's estimation, would have cost the company $846,319. [Id. at p. 21].

Pasek describes a second option as "more gradual reductions," involving a decrease of Hudson's workforce "by 15 fewer employees than it did in 2014, maintain[ing] its workforce in 2015, and reduc[ing] its workforce by five additional employees in 2016." [Id. at p. 20]. This second option would have cost Hudson $990,453. [Id. at p. 21]. Notably, both alternatives to triggering withdrawal liability would cost Hudson significantly less than the J&C Report's projections of "the cumulative additional labor costs through the end of the 2021 plan year …

14

rang[ing] from approximately $4.0 million to $14.4 million." [Dkt. No. 221-13 at p. 8]. Indeed, Pasek notes that the J&C Report's projections do not represent "realistic figure[s] for what modest additional costs the company would have incurred for years 2014-2016 … and which would have eliminated any risk of a partial withdrawal taking place through 2021 at no additional cost to the company through 2019." [Id. at p. 21].

Pasek goes on to describe four additional alternatives that, according to his estimates, would have permitted Hudson to meet the CBU threshold necessary to avoid withdrawal liability, without incurring the level of expenses described in the J&C Report. [Id. at pp. 22-23]. First, Pasek suggests "contribut[ing] to the Pension Fund for employees who would otherwise have been outside the bargaining unit[,]" such as "for hours worked by temporary employees even though they were not members of the union." [Id. at p. 22]. Pasek also suggests that "there were non-union clericals who could have been added to the union rolls[,]" though he concedes that such an option would be contingent on the Teamsters Union agreeing to that affiliation. [Id.]. Pasek further suggests the possibility of "contracting out work to the Boston Globe[,]" an option that had been broached by Grossi, Briggs, and Hudson's President and Chief Operating Officer, John Cirrone. [Id.]. Lastly, Pasek notes that Hudson could have resorted to a purchase or sale of "certain assets related to contribution obligations to the Pension Fund" under Section 4204 of ERISA. [Id. at p. 23]. Pasek acknowledges that some of these options would depend on factors outside Hudson's control, particularly the Teamster's cooperation in unionizing clerical workers. Pasek also refrains from ascribing a specific cost to any of the four latter suggestions.

### c. Actual Damages and Avoidance Cost

The gravamen of Bowditch's argument with respect to damages is that the face value of Hudson's $19.9M liability cannot be presented to a jury as determinative of Hudson's "actual

damages," as "[t]here would obviously have been a cost to avoiding the partial withdrawal liability." [Dkt. No. 239 at p. 1]. Bowditch asserts that "actual damages" amount to "the difference between the expense [Hudson] incurred and expense it would have incurred with purportedly proper advice"—in other words, net loss. [Id. at p. 13]. Relatedly, Bowditch argues that "[m]oney spent on an alternative course of conduct to avoid liability in the first instance is not mitigation of damages." [Id. at p. 5 (citing Alvarado v. Love & Hutson, G.P., 2021 WL 1428477, *10 (S.D. Tex., Apr. 15, 2021))]. Bowditch also argues that mitigation damages "ha[ve] no application to cases like this one where the plaintiff, not the defendant, is claiming that it could have taken an alternative course of conduct to prevent damages from arising in the first place." [Id. at p. 6].

Turning to Pasek's expert reports, Bowditch contends that the "speculative" alternate scenarios described, coupled with the absence of any tangible accounting as to what those alternatives would have cost as compared to the $19.9M liability, do not satisfy Hudson's burden to proffer "actual damages" sufficient to withstand summary judgment. Bowditch argues that this omission was reaffirmed in Pasek's deposition, during which he "acknowledged that there would be costs incurred by Hudson to avoid the withdrawal liability it triggered and confirmed that he was not retained to opine on the magnitude of harm suffered by Hudson caused by [Bowditch's] alleged conduct." [Dkt. No. 221 ¶¶ 43-50].

Hudson, in turn, simply reiterates that the $19.9M assessment represents its measure of damages. [Dkt. No. 230 at p. 1]. It further argues that, contrary to Bowditch's description of Pasek's expert reports, those assessments provided that "minimal changes in workforce would have easily allowed Hudson[] to comply with the ERISA thresholds[,]" and that the reports addressed the question of costs associated with such alternate hiring scenarios. [Dkt. No. 232 at pp. 2-3]. Hudson points out that one such cost calculation provided in Pasek's rebuttal report was

$846,319.[7]  [Id. at p. 21].  Hudson argues that any net loss calculation "is disputed and clearly for the jury to decide" after consideration of evidence of options which may have been available to Hudson upon different advice from Bowditch.  [Dkt. No. 245 at p. 3].  Hudson also emphasizes that expert testimony on damages is not required to satisfy that element of a malpractice claim under Massachusetts law.  [Id. at pp. 3-4].

Bowditch relies largely on Van Brode Group, Inc. v. Bowditch & Dewey, 36 Mass. App. Ct. 509 (1994) for the proposition that a "speculative" loss calculation cannot sustain the requisite damages element of a malpractice claim.  [Dkt. No. 220 at pp. 11-12].  In Van Brode, three sister corporations brought a legal malpractice action against their counsel, alleging that counsel had neglected the plaintiffs' interests in giving advice that led to their putting one subsidiary corporation into bankruptcy.  Id. at 510-11.  The plaintiffs argued that when they asked counsel for advice as to whether filing for bankruptcy was the appropriate solution for that subsidiary's insolvency, defendant counsel affirmed without raising the possible detrimental effects of bankruptcy on the parent and sister corporations, three of which—all named plaintiffs—sustained losses as a result.  Id. at 511.

In affirming the trial court's directed verdict for counsel, the Appeals Court stated that an "[e]xamination of the record convinces us that the evidence would not have warranted a finding that [plaintiffs] suffered a net loss as a result of the decision to put [the subsidiary] into bankruptcy."  Id. at 517 (emphasis added).  Turning to the record, the Appeals Court noted that "[t]he principal evidence offered by the plaintiffs to prove loss was the opinion of … an expert in

---

[7] In its reply to Hudson's opposition, Bowditch emphasizes that this figure "appears nowhere in Hudson's expert report[,]" and "mathematically backfills, with the benefit of hindsight, the exact number of hours it would have taken to avoid triggering a partial withdrawal liability through 2021[,]" rather than providing a "prospective analysis of how Hudson could have avoided the loss in real time[.]"  [Dkt. No. 239 at p. 4, n.2].  There is no question that the $846,319 figure appears in Pasek's second expert report.  [Dkt. No. 221-12 at p. 21].

business appraising and financial consulting." <u>Id.</u> The Court found that the expert's report had been correctly excluded from evidence by the trial court after "extensive voir dire concerning the basis for the appraiser's opinion." <u>Id.</u> at 519. Specifically, the expert had opined that, but for counsel's advice that filing for bankruptcy would be the best course of action, plaintiffs would have accepted a creditors' committee offer that would have generated $3.8 million for the subsidiary. <u>Id.</u> at 517-18. After pointing out that the creditors' offer was "a course in fact rejected by [plaintiffs] in favor of the bankruptcy filing[,]" <u>id.</u> at 518, the Appeals Court agreed with the trial court's reasoning for rejecting the expert opinion, finding:

> that it lacked sufficient foundation (and thus was speculative), in that the appraiser had not himself sufficiently analyzed the cost factors constraining [the subsidiary's] viability …, thus basing his opinion (in the judge's view) too much on industry-wide projections and not enough on factors peculiar to [the subsidiary], which, the appraiser acknowledged, was [at the time plaintiffs filed for bankruptcy], "hanging by a thread."

<u>Id.</u> at 519. The Appeals Court further noted that "[t]he [trial] judge could properly weigh that the expert had limited familiarity with the production costs and labor contracts that bore on [the subsidiary's] potential profitability … and that his entire opinion was predicated on such speculative factors as [plaintiffs'] acceptance of the creditors' ultimatum," which would have involved significant costs to plaintiffs. <u>Id.</u> at 520-21. Noting that a trial judge's discretion in admitting expert opinion testimony "is often applied in the context of expert prediction of profits to be made from startup business ventures[,]" the Appeals Court found that "the judge did not err in applying the same scrutiny to [the] expert['s] prediction of dramatic new profits to be realized in a business turnaround from a historic record of losses and only a single recent month of profitability." <u>Id.</u> at 520; <u>see also</u> <u>id.</u> at 522-23 ("To suggest that time would have restored [the subsidiary's] profitability so that it might have reopened and made good on its debts … is speculation, particularly when viewed against a history of monthly losses averaging $100,000.").

Drawing a parallel between the plaintiffs' inadmissible expert report in <u>Van Brode</u> and Pasek's report, Bowditch argues that "Hudson has clearly failed to meet its burden of proof on the required [damages] element[] of its claim … [as] Hudson is required to show, through non-speculative evidence, that [Bowditch] caused it actual harm—<u>i.e.</u>, the difference between the expense it incurred  and expense it would have incurred with purportedly proper advice—in order to allow a jury to make a reasoned finding as to damages."  [Dkt. No. 220 at p. 13].  However, there are significant distinctions between Pasek's reports in this case, and the expert testimony rejected in <u>Van Brode</u>.  First, the "speculative" damages assessment in the <u>Van Brode</u> report projected a net worth onto a then-insolvent subsidiary company "expressly predicated" on a rejected creditors' committee offer.  36 Mass. App. Ct. at 518.  Here, there is no question that Hudson paid approximately $22 million for a partial withdrawal Hudson claims is the fault of Bowditch's negligence.  Second, despite Bowditch's claims to the contrary, Pasek's second report plainly lays out costs for at least two means by which Hudson could have avoided triggering withdrawal liability: a "minimal employment" option costing Hudson $846,319, and a "more gradual reductions" option costing Hudson $990,453.  [Dkt. No. 221-12 at pp. 20-21].  Third, unlike <u>Van Brode</u>, here Bowditch has not moved to strike or otherwise challenge the admissibility of Pasek's reports, and there has been no "extensive voir dire" which might expose a basis for rejecting Pasek's expert reports.  Lastly, even accepting the report of Bowditch's experts, J&C estimate avoidance cost between $4 million and $14.4 million; thus their estimate still yields a net loss.  Indeed, in assessing the reports from Bowditch's experts, it does not appear—nor does Bowditch explicitly state—that the J&C report or Putnam's assessment definitively rule out Pasek's findings, rather than interpreting available data differently.[8]

---

[8] If Bowditch prevails in its argument that Pasek's conclusions are unrealistic or that the J&C report reflects a more palpable version of Hudson's liability avoidance cost before a jury, Bowditch would not be held liable for more than

2.        **Proximate Cause**

As prefaced, <u>supra</u>, the causation element applicable to a legal malpractice claim is closely related to the damages analysis, in that it "requires a plaintiff to prove that he 'probably would have obtained a better result had the attorney exercised adequate skill and care.'" <u>Greenspun v. Boghossian</u>, 95 Mass. App. Ct. 335, 339–40 (2019) (quoting <u>Kiribati Seafood Co., LLC v. Dechert LLP</u>, 478 Mass. 111, 117 (2017)).  "[I]f the outcome would remain unchanged regardless of the degree of care the attorney exercised, proximate cause is not shown." <u>In re Inofin Inc.</u>, 219 F. Supp. 3d 265, 274 (D. Mass. 2016) (citing <u>McCann v. Davis, Malm & D'Agostine</u>, 423 Mass. 558, 561 (1996).  Generally, the issue of proximate cause is one of fact for the jury. <u>Mullins v. Pine Manor Coll.</u>, 389 Mass. 47, 58 (1983).  However, the issue of whether an attorney's negligence was a proximate cause of a client's loss may be resolved at the summary judgment stage. <u>Glob. NAPs, Inc. v. Awiszus</u>, 457 Mass. 489, 500 (2010).

Bowditch contends that Hudson's causation theory is too speculative to survive a motion for summary judgment.  In Bowditch's estimation, Hudson has not presented any viable alternative advice Bowditch could have timely given Hudson to avoid partial withdrawal liability consistent with Bowditch's duty of care.  [Dkt. No. 220 at p. 7].  Bowditch points to Pasek's expert reports to argue that Pasek fails to provide any disclosures regarding a "causation analysis" and instead only "assumes that Hudson would have done whatever was necessary to have avoided triggering the withdrawal liability without stating what that would have entailed[.]"  [<u>Id.</u> at pp. 6-7].  Specifically, Bowditch claims that Pasek proposed only speculative options for avoiding

---

Hudson's net loss.  <u>See</u> <u>Moores v. Greenberg</u>, 834 F.2d 1105, 1110 (1st Cir. 1987) (holding, in a legal malpractice case, that the plaintiff's damages award should be diminished by the defendant attorney's contingency fee, as damages serve "to 'place plaintiff in the same position he would have been in had there been no breach[.]'"); <u>see also</u> <u>id.</u> at 1111 (establishing that "[a]n attorney who [commits malpractice] is liable to his client for any reasonably foreseeable loss caused by his negligence[,]" and concluding it was reasonably foreseeable that, "by failing to communicate [a settlement] offer, [the defendant attorney] would effectively deprive his client of the net benefit of the tendered bargain—nothing more.").

withdrawal liability, including "(1) hire and make contributions through temporary employees; (2) unionize clerical employees and pay for additional hours through them; (3) contract work out to third parties … ; or (4) buy or sell certain assets through Section 4204 of ERISA[,]" without assessing the feasibility of any one of those plans, or how they would have left Hudson in a better position than triggering withdrawal liability.  [Id. at p. 8].  Lastly, Bowditch interprets Van Brode as holding that certain "debt payments alleged as damages [but] mandated by federal law[,]" such as Hudson's partial withdrawal liability, "are unavoidable, precluding the possibility that such costs are proximately caused by malpractice."  [Dkt. No. 220 at p. 12].

Hudson, in turn, argues that Bowditch "robbed [it] of the ability to manage its exposure to a potential partial withdrawal liability, and, accordingly, causation is clear."  [Dkt. No. 230, at p. 15].  Relying largely on Williams v. Ely, 423 Mass. 467 (1996), Hudson frames the issue of causation as one of notice and opportunity regarding alternative options Bowditch allegedly should have proposed, rather than viability.  In Williams, the Massachusetts Supreme Judicial Court ("SJC") affirmed a Superior Court judgment holding several partners at a now-defunct firm liable to clients under a legal malpractice theory.  Id. at 476-78.  The Superior Court had found that the attorneys were negligent in advising the plaintiff clients on disclaiming their interest in a trust, as the attorneys were not sufficiently forthcoming in explaining an ambiguity in the law that resulted in the clients incurring an unexpected gift tax liability.  Id. at 476.

In reviewing liability, the SJC explained that "[t]he problem is not that [the attorney defendants] gave reasonable advice that in time proved to be wrong. The problem is that the apparent certainty of the opinion given, at a time when the issue was not conclusively resolved, denied the plaintiffs the opportunity to assess the risk and to elect to follow alternative estate planning options."  Id. (emphasis added).  In Hudson's view, it was of no moment that the court

in <u>Williams</u> could only speculate "as to what the plaintiffs would have done with the family trust assets, if they had received them[,]" and whether they may have in fact "obtained offsetting tax benefits," which was the defendants' unmet burden to prove.  <u>Id.</u> at 477.  The SJC further found that while a couple of the plaintiffs "knew that [the defendant firm] did not guarantee that its opinion was correct[,] [t]he absence of a guarantee does not … foreclose liability for the adverse consequence of a negligent failure to advise a client of the uncertainty of the advice given."  <u>Id.</u> (citing <u>Hendrickson v. Sears</u>, 365 Mass. 83, 90, 310 N.E.2d 131 (1974) ("The attorney owes his client a duty of full and fair disclosure of facts material to the client's interests")).

Both Bowditch and Hudson appear to somewhat overcomplicate Hudson's requisite proximate cause showing here.  Hudson's burden is to simply show that it might have obtained a better result than the $19.9M liability had Bowdich exercised adequate skill and care.  <u>See</u> <u>Kiribati Seafood Co., LLC</u>, 478 Mass. at 117.  Bowditch does not provide authority for its argument that to avoid summary judgment Hudson must establish a cost and viability analysis along with the allegedly speculative alternative options it may have pursued to sufficiently plead proximate cause.

### 3.  Questions of Material Fact

When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  This Court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." <u>Noonan v. Staples, Inc.</u>, 556 F.3d 20, 25 (1st Cir. 2009).

The issue prompted by Bowditch's motion is thus whether Hudson has proffered—by way of Pasek's expert reports, depositions, and other evidence—sufficiently specific facts showing that it has sustained a net loss as a result of Bowditch's alleged negligence.  I find that Hudson has met

that burden.  I further find that Pasek's rebuttal of Johnson and Cislo's damages analysis has created, at the very least, a genuine issue as to whether Hudson would have incurred a significant avoidance cost in lieu of its partial withdrawal liability.  More fundamentally, however, the viability of alternative paths Hudson may have pursued instead of triggering a partial withdrawal liability—which includes measuring an "avoidance cost"—is a question of fact for a jury.  None of the authorities cited by Bowditch suggest that "viability" or "avoidance cost" need be calculated and substantiated with precision in order to survive a motion for summary judgment.

First, Bowditch's own expert report persuasively indicates that Hudson's net loss, or avoidance cost, is disputed.  Johnson and Cislo point out that the "calculation of damages" in Pasek's first expert report[9] is "unreasonable as it fails to consider several relevant factors in a 'but-for' scenario[,]" including the "labor and burden costs associated with maintaining Hudson's union headcount."  [Dkt. No. 221-13 at p. 6].  They proceed to conclude that "the cumulative additional labor costs through the end of the 2021 plan year would range from approximately $4.0 million to $14.4 million."  [Id. at p. 8].  Aside from the fact that Johnson and Cislo's highest hypothetical avoidance cost would still yield a net loss of about $5M to Hudson, there is a considerable range between the two avoidance costs the J&C report describes, dependent on factors such as inflation, "additional labor costs," and "low and high estimates of hourly rates."  [Id. at p. 6].

Moreover, Pasek has supported his opinion that Hudson had viable and less costly alternatives to triggering the $19.9M liability sufficiently to indicate a genuine issue for trial.  Specifically, he applied CBU data to describe two such alternatives, the "minimal employment" and "more gradual reductions" options, which Pasek argues would have cost Hudson $846,319, or $990,453, respectively.  [Dkt. No. 221-12 at pp. 20-21].  Pasek has also maintained throughout his

---

[9] While Bowditch staunchly maintains that Pasek has never provided any damages calculation, its experts Johnson and Cislo refer to the preliminary damages calculation Pasek provided in his first report.

reports that the partial withdrawal liability was avoidable.  During his deposition, for instance, he states that "[w]hen [he] received the Cislo and Johnson report, which suggested, in effect, that there had been no harm, [h]e went back and looked at the data to verify that the harm was really quite real and could fairly reasonably have been abated."  [Dkt. No. 221-10 at p. 23].  Pasek also reasonably argues that the J&C report relies on two "misunderstanding[s] of [ERISA] law" in calculating Hudson's damages and hypothetical avoidance costs, yielding inaccurate results.  [Id. at pp. 26-28].  In short, there is little indication that Pasek's conclusions have been dispositively eliminated by Bowditch's proffered evidence to date.[10]

For all these reasons, I recommend that Bowditch's motion for summary judgment be denied.

### B.  Bowditch's Contribution Claim Against Marcum

Marcum moves for summary judgment on Bowditch's contribution claim.

A tortfeasor may seek contribution if he "has paid more than his pro rata share of the common liability, and his total recovery shall be limited to the amount paid by him in excess of his pro rata share."  M.G.L. ch. 231B, § 1.  Contribution remedies "the unfairness of allowing a disproportionate share of the [plaintiff's] recovery to be borne by one of several joint tortfeasors, and the object to be accomplished [is] a more equitable distribution of that burden among those liable in tort for the same injury."  McCrohan v. Sandulli Grace, P.C., 369 F. Supp. 3d 324, 331 (D. Mass. 2019) (internal citations omitted); see also Wolfe v. Ford Motor, Inc., 386 Mass. 95, 100 (1982) ("[t]he statutory concern is with joint liability in tort for the same injury, not with whether

---

[10] Bowditch also emphasizes a statement Pasek made during his deposition to the effect that Hudson would have had to incur "an additional cost" to avoid triggering partial withdrawal liability, and that "whether it's a net cost or not, [he] can't tell … [as] [he] d[oesn't] have the data to do that analysis and … it would be rather complicated."  [Dkt. No. 221-10 at p. 26].  However, Pasek is referring to whether the avoidance cost itself is a net cost or net saving, not whether Hudson had incurred a net loss at all; he reiterates his opinion that Hudson had indeed incurred a net loss definitively at several other points in his reports and during his deposition.

such joint liability is based on the same theory").  A right of contribution exists only if "the party would be 'directly liable to the injured person.'"  LeBlanc v. Logan Hilton Joint Venture, 463 Mass. 316, 326 (2012) (quoting O'Mara v. H.P. Hood & Sons, 359 Mass. 235, 238 (1971)).

Accordingly, Bowditch bears the burden of demonstrating that Marcum, as Hudson's accountant, could be held liable in tort to Hudson for the Fund's assessment, whether under a professional malpractice or negligence theory.  Larson v. Landvest, Inc., 2005 WL 1812471, at *7 (Mass. Super. June 3, 2005) ("In order to fall within the scope of [] 231B, the parties need to show that they are both liable in tort" for the same injury to the plaintiff, even if on different theories of liability).  Under either theory, Bowditch must show that Marcum had a duty to Hudson, breached that duty, and, as a result, jointly caused Hudson's partial withdrawal liability.  RTR Techs., Inc. v. Helming, 815 F. Supp. 2d 411, 424 (D. Mass. 2011), aff'd on other grounds, 707 F.3d 84 (1st Cir. 2013) (internal citation omitted) (assessing a claim of professional malpractice against an accountant under "a classical tort negligence standard").

As the summary judgment movant, Marcum "has the burden of demonstrating that there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law."  Parent v. Stone & Webster Eng'g Corp., 408 Mass. 108, 112 (1990).  Marcum advances three arguments supporting summary judgment.  First, Marcum argues that Bowditch cannot show that Marcum had a duty to protect Hudson from withdrawal liability as "the record is undisputed that Hudson did not hire Marcum to assess withdrawal liability as part of the audit engagements[,]" and Marcum's duty to Hudson "can be no broader than its contractual undertaking[.]"  [Dkt. No. 217 at p. 2].  Second, Marcum argues that Bowditch's own expert, Donald Walker ("Walker"),[11]

---

[11] Walker certifies that he has been a CPA for more than fifty years and has "audited and managed audits or large and small business entities" and provided consulting services.  [Dkt. No. 228-1 at p. 4].

concluded that "Marcum's <u>sole</u> duty was to determine if Hudson had previously triggered a partial withdrawal in the prior fiscal year under audit, and if so, to advise Hudson to disclose the partial withdrawal in the financial statement." [<u>Id.</u>].  Therefore, Marcum argues that its actions pursuant to its auditing engagement cannot have caused the "same injury" to Hudson, as any failure to detect Hudson's partial withdrawal would have been after the fact of a withdrawal. [<u>Id.</u>].  Lastly, Marcum asserts that Bowditch's contribution claim is time-barred.  [<u>Id.</u> at p. 3].

### 1.  Marcum and Hudson's Engagement Agreements

Marcum asserts it should be granted summary judgment because its various engagement letters do not include or contemplate evaluating withdrawal liability.  An axiomatic principle of contract construction "is to give effect to the intention of the parties as gathered from the language of the agreement viewed in the light of all the circumstances under which it was made." <u>Greenly v. Mariner Mgmt. Group, Inc.</u>, 192 F.3d 22, 26 (1st Cir.1999).  Unambiguous provisions in "any … contract, must be interpreted as written, 'giving force to their plain meaning.'" <u>Wright-Ryan Const., Inc. v. AIG Ins. Co. of Canada</u>, 647 F.3d 411, 414 (1st Cir. 2011) (quoting <u>Greenly</u>, 192 F.3d at 26).  Moreover, a provision will only be deemed ambiguous "when an ordinary person would not understand that the provision has a single accepted meaning." <u>Id.</u>  In support of this principle, Marcum cites several New York State cases which recognize the dispositive impact of an accountant's engagement contract.  [Dkt. No. 217 at p. 9 ("<u>See, e.g.</u>, <u>Italia Imports v. Weisberg & Lesk</u>, 220 A.D.2d 226, 226-227 (N.Y. App Div. 1995) ("[T]he clear engagement letter governs the terms of the parties' relationship and, as a matter of law, cannot be altered by the alleged parol or extrinsic evidence."); <u>Darby Scott, Ltd. v Michael S. Libock & Co. LLC CPAs</u>, 2020 N.Y. Misc. LEXIS 10941, *32 (N.Y. Sup. Ct., Dec. 31, 2020) ("Although the scope of professional accounting

standards generally go beyond simple bookkeeping and auditing, the obligations may be expressly defined, and limited, by the terms of the parties' engagement agreement.")]].

The record shows Hudson hired Marcum, an accounting firm, to conduct audits of Hudson's financial statements for the fiscal years ending in December 2012, December 2013, December 2014, January 2016, January 2017, and December 2017.  [Dkt. No. 218 ¶ 28].  Hudson and Marcum executed engagement letters for each of the six audits Marcum conducted.  [Id. at ¶ 35].  It is undisputed that the engagement letters nowhere state that Hudson hired Marcum to determine pension fund withdrawal liability.  [Dkt. No. 227 at pp. 4-5; Dkt No 217 at p 9 ("[n]owhere do the engagement letters state that Marcum was engaged to determine if Hudson had triggered a partial withdrawal[.]")]].  Indeed, the engagement letters explicitly limit Marcum's undertaking, stating that Marcum "was not hired to conduct a 'special audit' or 'to design procedures for the purpose of identifying … the process used by [Hudson] in formulating particularly sensitive accounting estimates[.]'"  [Dkt. No. 240 at p. 2].

On the basis of this record and the above-cited law, Marcum argues that its duty to Hudson as an auditor "can be no broader than the scope of [its] contractual undertaking."  [Dkt. No. 217 at p. 8].  Marcum points to the absence of any language in its multiple engagement letters with Hudson that Hudson engaged Marcum "to provide advice regarding monitoring workforce reductions[.]"  [Id. at 9].  Reflecting the intention of the parties, Marcum stresses that Hudson, as the other party to the engagement agreements, shares the same understanding of the scope of Marcum's engagement as auditor.  [Dkt. No. 240 at p. 2].  Hudson "did not engage Marcum to provide advice regarding its compliance with ERISA, monitoring its workforce reduction, or whether any such reduction could trigger a partial withdrawal[.]"  [Dkt. No. 232 at p. 1].  Marcum points to the scope of its professional services: it is an auditor and hence is "not qualified" to

interpret and apply ERISA.  Lastly, Marcum disputes Bowditch's contention that "the scope of a duty is a question of fact that can 'only' be established through expert testimony."  [Id. at p. 3 (citing Glidden v. Terranova, 12 Mass. App. Ct. 597, 599-600 (1981))].  Accordingly, Marcum asserts summary judgment is proper.

In response, Bowditch concedes that (i) "the scope of [Marcum's] duty is defined by the terms of its engagement letters[,]" and that (ii) "the engagement letters do not specifically state that Marcum was engaged to determine whether Hudson had triggered a partial withdrawal[.]" [Dkt. No. 227 at pp. 4-5].  Bowditch instead proposes that because the engagement letters require Marcum to discharge its duties in compliance with Generally Accepted Auditing Standards ("GAAS"),[12] the scope of Marcum's duty under those standards is a question of fact that can be established "only through expert testimony." [Dkt. No. 227 at pp. 4-5].  Bowditch further contends those standards "required Marcum to review the work papers supporting Hudson's [] treatment of the pension fund contingent liability[,]" [id. at p. 5], and that "given Marcum's duty under GAAS, it could have, and should have, discovered before 2017 that Hudson was using the incorrect formula." [Id. at p. 7].

### a.  Marcum's Duty of Care

As a general matter, a duty of care arises from the accountant-client relationship and is necessary in order to state a malpractice claim.  In re TelexFree Sec. Litig., 358 F. Supp. 3d 112, 117 (D. Mass. 2019) (citing Max-Planck-Gesellschaft Zur Foerderung Der Wissenschaften E. V. v. Wolf, Greenfield, and Sacks, PC., 736 F.Supp.2d 353, 359 (D. Mass. 2010)).  "For professional

---

[12] The Public Company Accounting Oversight Board ("PCAOB"), created by the Sarbanes Oxley Act of 2002, establishes and maintains standards that auditors must follow in auditing U.S. public companies.  See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 484–85 (2010).  Among these standards are GAAS, codified as AU § 150 in the PCAOB standards.  Miller Inv. Tr. v. Morgan Stanley & Co., LLC, 308 F. Supp. 3d 411, 429 (D. Mass. 2018).

malpractice claims, the court's inquiry centers on whether the defendant 'failed to exercise reasonable care and skill in handling the client's matter[.]'" RTR Techs., Inc., 815 F. Supp. 2d at 424.  "Accountants are subject generally to the same rules of liability for negligence in the preparation of tax returns for others as members of other skilled professions are in the practice of their professions." 81 A.L.R.3d 1119, § 3 (West 2011); see also Miller v. Volk, 63 Mass. App. Ct. 303 (2005) (applying traditional negligence standard in malpractice case against accountant for provision of negligent tax advice).

Accordingly, certain contractual duties, such as those arising from attorney-client or accountant-client relationships, can generate obligations not expressed in a contract.  See Bd. of Trustees of IBEW Loc. 43 Elec. Contractors Health & Welfare, Annuity & Pension Funds v. D'Arcangelo & Co., LLP, 1 N.Y.S.3d 659, 661 (2015) ("Accounting malpractice or professional negligence contemplates a failure to exercise due care and proof of a material deviation from the recognized and accepted professional standards for accountants and auditors, generally measured by [generally accepted accounting principles (GAAP)] and [generally accepted auditing standards (GAAS)][13] …, which proximately causes damage to plaintiff"); see also Nycal Corp. v. KPMG Peat Marwick LLP., 426 Mass. 491, 498 (1998) (finding that an accountant can be held liable to a third party with whom it is not in privity if the third party "can demonstrate 'actual knowledge on the part of accountants of the limited—though unnamed—group of potential [third parties] that

---

[13] Walker and Hildebrand distinguish between the GAAS and the GAAP, the Generally Accepted Accounting Principles.  The latter "embody the prevailing principles, conventions, and procedures defined by the accounting industry from time to time," Young v. Lepone, 305 F.3d 1, 5 n.1 (1st Cir. 2002), and provide professional guidance in accounting and disclosure matters for financial reporting.  "Because the GAAP are meant to embody contemporary conventions and procedures, 'GAAP changes and, even at any one point, is often indeterminate.'"  Miller Inv. Tr. v. Morgan Stanley & Co., LLC, 308 F. Supp. 3d 411, 442 (D. Mass. 2018) (quoting Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 101 (1995)).  "This is in contrast to the PCAOB standards that, although requiring the exercise of discretion, can be identified from one source, and for which a statement of compliance is less a statement of belief than an assertion carrying some certainty."  Id. (internal citations omitted).  In this case, the GAAP apply to Hudson as the company providing the auditor financial statements.

will rely upon the [report], as well as actual knowledge of the particular financial transaction that such information is designed to influence.'") (internal citation omitted).

In consideration of this case law, Bowditch's argument that Marcum's alleged breach of GAAS could support a hypothetical tort claim brought by Hudson is not implausible. Bowditch is also correct that under Massachusetts law, once the existence of a duty is established, the scope of that duty is generally a question of fact. See, e.g., Cheshire Med. Ctr. v. W.R. Grace & Co., 49 F.3d 26, 34 (1st Cir. 1995) ("determinations of liability (whether under a concept of 'duty' or 'cause' or some other terminology such as 'scope of liability') are never exclusively 'fact' questions to be decided by a jury, or by a judge as factfinder in a non-jury trial"); Shea v. Caritas Carney Hosp., Inc., 79 Mass. App. Ct. 530, 539 n.12 (2011) ("Although juries are uniquely qualified to determine the scope of the duty at issue, the existence of a duty, including an ordinary duty of reasonable care, 'is a question of law appropriate for resolution by summary judgment.'").[14]

### b. Does GAAS Support Marcum's Obligation to Assess Hudson's Withdrawal Liability Under the Engagement Agreements?

The issue on summary judgment is whether Marcum's undisputed duty to comply with GAAS in conducting its annual audits creates a question of fact as to whether it was required to investigate Hudson's ERISA compliance more closely, and notice and alert Hudson of the potential for partial withdrawal liability.

To support its position, Bowditch relies on the report of its expert, Walker. Walker "opined that Marcum had an obligation to ensure that this contingent liability[,]" namely the partial

---

[14] Other jurisdictions treat scope of duty as a question of law. See, e.g., Milliken & Co. v. Consol. Edison Co. of New York, 84 N.Y.2d 469, 477 (1994) ("the existence and scope of an alleged tortfeasor's duty, at the threshold, is a legal, policy-laden determination dependent on consideration of different forces, including logic, science, competing socioeconomic policies, and contractual assumptions of responsibility.").

withdrawal, "was properly accounted for and disclosed, that Marcum failed to do this, and that had Marcum met the standard of care, Hudson's error would have been discovered no later than 2014." [Dkt. No. 227 at p. 3].  Walker relies on two pieces of information to support that conclusion: first, as reflected in annual financial statements, Marcum was aware that Hudson's fiscal year contributions to the pension fund were "decreasing significantly" and, as a result, Marcum "should have suspected a possible partial withdrawal in 2013 and taken this pattern into account in planning each of its audits from 2013 forward."  [Dkt. No. 228-1 at p. 16].  Second, "the Marcum audit partner stated in his deposition that he had other clients with multiemployer pension plans and as a result should have been aware of the potential for withdrawal or partial withdrawal liabilities at [Hudson] given the downsizing of its union workforce[.]"  [Id. at pp. 7, 16].  Walker cites to a number of provisions of GAAS to argue that, under the circumstances, GAAS may have enlarged the scope of Marcum's duty to include an obligation to investigate withdrawal liability.

As an initial matter, it is somewhat problematic for Bowditch to argue that the reference to GAAS in the engagement letters alone creates a question of fact as to whether Marcum's duty contemplated such an obligation.  It is settled that the interpretation of a contract, such as Marcum and Hudson's engagement agreements, is a question of law.  James B. Nutter & Co. v. Est. of Murphy, 478 Mass. 664, 667 (2018).  As mentioned supra, while the existence of a duty is similarly a question of law suitably determined by a court, the scope of an established duty is generally treated as a question of fact for a jury.  See, e.g., Cottam v. CVS Pharmacy, 436 Mass. 316, 324 (2002) ("Defining the scope of the duty assumed is a fact-specific inquiry.").  Bowditch appears to argue that the mere existence of a duty—here, Marcum's duty to conduct a GAAS-compliant audit under the engagement agreements—could trigger questions of fact as to whether that duty contemplates auditing tasks outside the engagement, such as ERISA withdrawal liability.

31

### c.  Absence of a Genuine Issue as to Marcum's ERISA-Related Duty

Nevertheless, even accepting Bowditch's argument that the reference to GAAS creates a question of fact as to whether the scope of Marcum's duty contemplated Hudson's risk of incurring withdrawal liability, Bowditch has failed to establish that there is a genuine issue as to this question of fact.  First, looking to Walker's expert report, it is unclear how the GAAS provisions he cites support the duty Bowditch argues Marcum owed to assess Hudson's risk of triggering partial withdrawal liability.  For instance, Walker quotes GAAS guidance providing that "[d]ue care requires the auditor to discharge professional responsibilities with competence and to have the appropriate capabilities to perform the audit[,]" and an "auditor should not represent compliance with GAAS in the auditor's report unless the auditor has complied with the requirements of this section[.]"  [See Dkt. No. 228-1 at p. 13, 16 (quoting AU-C §200.22)].  However, these plainly refer to how Marcum must approach its work, not the scope of it.  Other AU-C provisions Walker cites—including those speaking to preparing an "audit plan" under Section 300.09, or considering the "relevance and reliability" of audit evidence under Section 500A—also speak in generalities regarding proper approaches to conducting an audit, rather than the scope of an audit.  [Dkt. No. 228-1 at pp. 16-18].  Certainly, "due care" or compliance with GAAS imposes standards for performance, but an interpretation of "due care" to enlarge the express scope of Hudson's engagement to include determining whether Hudson has effected a withdrawal from the pension fund seems unreasonably expansive.

Walker also states that under GAAS an auditor must "design and perform audit procedures to identify litigation, claims, and assessments involving the entity that may give rise to a risk of material misstatement."  [Id. at p. 21 (quoting AU-C §501A.16)].  However, other provisions of Section 501A undercut his conclusion that Marcum breached that GAAS directive.  For instance, AU-C Section 501A provides that one of "[t]he objective[s] of the auditor is to obtain sufficient

appropriate audit evidence regarding the … completeness of litigation, claims, and assessments involving the entity[.]"   AU-C §501A.03.   To facilitate this objective, GAAS provides that "[m]anagement is responsible for adopting policies and procedures to identify, evaluate, and account for litigation, claims, and assessments as a basis for the preparation of financial statements[.]"  AU-C §501A.A41.  Noting that:

> [m]anagement is the primary source of information about events or conditions considered in the financial accounting for, and reporting of, litigation, claims, and assessments … the auditor's procedures with respect to litigation, claims, and assessments include … [m]aking inquiries of management … which may include a discussion about the policies and procedures adopted for identifying, evaluating, and accounting for litigation, claims, and assessments … [and] [o]btaining written representations from management … that all known actual or possible litigation, claims, and assessments whose effects should be considered when preparing the financial statements have been disclosed to the auditor and accounted for[.]

AU-C §501A.A42 (emphasis added).

Further, GAAS elsewhere provides, "[a]n auditor ordinarily does not possess legal skills and, therefore, cannot make legal judgments concerning information coming to the auditor's attention."  AU-C §501A.A46.  GAAS plainly does not suggest that auditors have a duty to initiate a dive into legal matters where management has failed to turn over documents associated with potential litigation, claims, or assessments, and where such liabilities are not otherwise flagged by management.  See, e.g., AU-C §501A.A49 ("A letter of inquiry to the entity's legal counsel is the auditor's primary means of obtaining corroboration of the information provided by management concerning material litigation, claims, and assessments.").

But the overarching issue with Walker's report is that GAAS provisions on which he relies are simply too general and hence too malleable to persuasively be the genesis of a specific, large-scale, and specialized undertaking, such as assessing the risk of pension fund withdrawal.  Indeed,

if Walker were correct, then an auditor could never safely limit the scope of its engagement; there would always be the risk that GAAS standards could be stretched to mean something the parties never intended, as here.  In fact, accepting Bowditch's argument would mean that generally an audit of a company participating in a multiemployer pension fund would involve determining pension fund contributions and assessing withdrawal liability.  Such would seemingly impose on Marcum and every auditor a duty to effectively provide legal advice.  I find that Walker's interpretation of GAAS standards here undermines the intent of the parties, and would serve to virtually nullify explicit provisions in Marcum and Hudson's engagement agreements.

Moreover, it has been recognized that ERISA is a particularly complex area of statutory law.  See, e.g., Conkright v. Frommert, 559 U.S. 506, 509 (2010) ("the Employee Retirement Income Security Act of 1974 is 'an enormously complex and detailed statute,' and the plans that administrators must construe can be lengthy and complicated[]") (citation omitted).  One would expect that an audit contemplating ERISA compliance would be expressly addressed in an engagement agreement and in the price an auditor charged for such a service.  Here, by contrast, not only is the agreement silent on assessing withdrawal liability, but Marcum expressly sought in the engagement letters to limit the scope of its work, noting it "was not hired to conduct a 'special audit' or 'to design procedures for the purpose of identifying … the process used by [Hudson] in formulating particularly sensitive accounting estimates[.]'"  [Dkt. No. 240 at p. 2].  Lastly, while holding Marcum to a standard of knowledge or expertise on ERISA sufficient to effectively opine on Hudson's staffing reductions is a tenuous proposition, Bowditch does not suggest Hudson ever even provided Marcum Ben Walter's spreadsheet for review or discussion.[15]  Bowditch instead

---

[15] The record also reflects that Marcum was not sent Walter's spreadsheet for the purposes of its audits.  [See Dkt. No. 218-4 at p. 7 (asked during his deposition whether, aside from "going over the numbers with the controller," Walter

argues that "Marcum was <u>obligated to ask Hudson for the withdrawal liability spreadsheet</u> and confirm that this contingent liability was being handled properly so that the disclosure in the financial statement was accurate."  [Dkt. No. 227 at p. 4 (emphasis added)].

Walker also fails to give any tangible examples—whether in case law, auditing procedure literature, or otherwise—that GAAS mandates a withdrawal-focused skepticism Bowditch argues Marcum should have brought to the audits, or that Marcum failed to exercise the "skill and judgment which can be reasonably expected from similarly situated professionals" sufficient to find a breach of that alleged duty.  <u>LeBlanc v. Logan Hilton Joint Venture</u>, 463 Mass. 316, 329 (2012).  In a rebuttal report commissioned by Marcum, Hildebrand echoes this deficiency, concluding that to conform to GAAS, "the role of the auditor is to obtain reasonable, but not absolute, assurance about whether the financial statements as a whole are free from material misstatement as of a certain date[,]" and, crucially, that "the financial statements themselves are the responsibility of management of the company under audit."  [Dkt. No. 228-2 at pp. 6, 10]; <u>see also id.</u> (noting that the engagement agreements provide that "[t]he financial statements are the responsibility of [Hudson's] management, and [Marcum's] audit of the financial statements does not relieve management or those charged with governance of such responsibility … the selection of accounting principles and method of application is a determination made solely by management or those charged with governance.")].

In sum, Bowditch's argument and Walker's opinion fail to raise a genuine issue.  The proposed expansion of Marcum's undertaking on the basis of GAAS is simply too far-reaching.  It flies in the face of the plain language of the engagement agreements and the understanding and

---

"show[ed] [the] spreadsheets to anyone else[,]" Walter answered only that "[o]nce [he] put the spreadsheet together, [he] sent it off to [Hudson's] attorneys for their review.")].

intent of the parties to those agreements.  Further, as a matter of policy, it would undermine the basic right of parties to agree on the scope of a contract, if generalized professional standards could effect such a drastic enlargement of Marcum's contractual engagement, especially relating to a subject that is complicated and would have required Marcum, an accounting practice, to render a legal opinion.  While the "scope" of Marcum's duty under the engagement agreements may be a question of fact, Bowditch fails to show—whether on the basis of Walker's expert report or otherwise—that a genuine issue actually exists as to whether Marcum's duty to Hudson included anything related to Hudson's ERISA compliance here.

### d.  If GAAS Did Support Such an Obligation, Would Marcum's Alleged Breach Have Proximately Caused Hudson's Damages?

Finally, even if, _arguendo_, one were to accept that under GAAS and the circumstances of this engagement, Marcum's duty could plausibly encompass an obligation to monitor and report on the risk of a partial withdrawal, there is no showing that Marcum's alleged breach of that obligation would be causally related to Hudson's damages.  The clearest articulation of Marcum's alleged duty under the GAAS provisions cited _supra_ would have at most triggered Marcum's obligation to either confer with Hudson or Bowditch upon identifying a potentially problematic annual decline in Fund contributions.  See, e.g., AU-C §§501A.A42, A49.  The result of those hypothetical conversations is pure speculation, and Bowditch does not advance any evidence as to what it would have done had Marcum alerted it as to Hudson's Fund contribution numbers.  On the other hand, if Marcum had made such an inquiry to Hudson, the fairest inference from the record is that Hudson's HR Manager Ben Walter would have represented that Bowditch had signed off on the formula he was using to reduce Hudson's workforce without triggering a withdrawal. Indeed, Walter's written documentation—the spreadsheet—would simply have affirmed what

Walter himself represented: that the reduction in the number of employees (and hence Hudson's pension fund obligation) was according to the schedule Bowditch never corrected.

For the foregoing reasons, I recommend that Marcum's motion for summary judgment be granted on this ground.

### 2.   Whether Marcum's Alleged Negligence Could Have Caused the "Same Injury"

Marcum next posits that any alleged negligence or breach on its part could not have caused the "same injury" identified in Hudson's complaint, given the backward-looking nature of its audits.  [Dkt. No. 217 at p. 2].  Marcum particularly stresses its argument that according to Bowditch's own expert, Walker, "an auditor's work is purely backward looking[,]" and "Marcum's sole duty was to determine if Hudson had previously triggered a partial withdrawal in the prior fiscal year under audit[.]"  [Id. at p. 10].  Marcum argues that any "failure to do [a] backward looking analysis in 2018 (i.e., the breach) could not have caused the partial withdrawal that was triggered on September 30, 2017 (i.e., the injury) because, by definition, causation requires the breach to precede the injury."  [Id. at p. 13 (citing Fletcher Fixed Income Alpha Fund, Ltd. v. Grant Thornton LLP, 89 Mass. App. Ct. 718, 726 (2016)].  In its reply to Bowditch's opposition, Marcum argues that Bowditch, as evidenced by Walker's report and deposition, is unable to "connect the dots between Marcum's backward[-]looking duty and the partial withdrawal" triggered in September 2017.  [Dkt. No. 240 at pp. 7-8].  Bowditch, in turn, contends that "given Marcum's duty under GAAS, during its audits, it could have, and should have, discovered before 2017 that Hudson was using the incorrect formula."  [Dkt. No. 227, at p. 7].

I am unpersuaded that the retrospective nature of Marcum's audits alone inherently insulates it from any liability for the "same injury" to Hudson, namely failing to alert Hudson as to the risk of triggering partial withdrawal.  If Marcum's audits had been prepared at the end of

each fiscal year leading up to Hudson triggering the partial withdrawal in 2017 with some focus on tracking Fund contributions, Marcum could have theoretically identified and flagged the continuous decline starting in 2013 in time for Hudson to address the risk of the Fund's assessment. Nevertheless, I find that the more fundamental issue with Bowditch's claim, as discussed <u>supra</u>, is that Marcum did not have a duty to Hudson to unilaterally investigate and alert Hudson to a potential withdrawal.

### 3.   Procedural Time Bar

Marcum lastly argues that two distinct time bars preclude Bowditch's third-party claim: a three-year statutory limitation, and a one-year contractual limitation.   Finding that Bowditch's contribution claim is timely under each, I recommend that Marcum's motion for summary judgment be denied on this separate ground.

### a.   Statutory Time Bar

"In Massachusetts, the applicable time period for a claim of malpractice by a certified public accountant is three years."   <u>RTR Techs., Inc.</u>, 815 F. Supp. 2d at 420 (citing M.G.L. ch. 260, § 4 ("Actions of contract or tort for malpractice, error or mistake against attorneys, certified public accountants and public accountants ... shall be commenced only within three years next after the cause of action accrues.")).   Massachusetts employs the "discovery rule" to determine the accrual date for accountant malpractice claims.   <u>Kennedy v. Goffstein</u>, 62 Mass. App. Ct. 230 (2004).   This rule provides that the statute of limitations begins to run when a plaintiff "knows or reasonably should know that he or she has sustained appreciable harm as a result of the [defendant's] conduct."   <u>Lyons v. Nutt</u>, 436 Mass. 244, 247 (2002) (citation omitted).   The discovery rule imposes a "duty to investigate" on a plaintiff who has cause for concern.   <u>Epstein v. CR Bard, Inc.</u>, 460 F.3d 183, 188 (1st Cir. 2006).   However, "Massachusetts law provides for

equitable tolling where 'the factual basis for the cause of action [was] 'inherently unknowable' at the time of the injury.'"   Sorenson v. H & R Block, Inc., 2002 WL 31194868, at *12, n.13 (D. Mass. Aug. 27, 2002), aff'd, 107 F. App'x 227 (1st Cir. 2004) (quoting Geo. Knight & Co., Inc. v. Watson Wyatt & Co., 170 F.3d 210, 213 (1st Cir. 1999)).  "The factual basis for a cause of action is considered to be 'inherently unknowable' if it is 'incapable of detection by the wronged party through the exercise of reasonable diligence."   Geo. Knight, 170 F.3d at 213 (1st Cir. 1999) (quoting Tagliente v. Himmer, 949 F.2d 1, 4 (1st Cir.1991)).

In the case of a contribution claim, as Marcum notes, "a third-party contribution claim fail[s] where the plaintiff's direct claims against the third-party defendant [are] time-barred by the applicable statute of repose."  [Dkt. No. 217 at p. 15 (citing Dighton v. Federal Pac. Elec. Co., 399 Mass. 687 (1987)].  In other words, if a statute of limitations operated to bar the plaintiff from bringing a direct claim against the third-party defendant, then the limitations period would similarly bar a contribution claim by the third-party plaintiff.

Arguing that M.G.L. c. 260, § 4 applies to malpractice claims against CPAs, Marcum recognizes that Hudson's hypothetical three-year statutory limitations period would have expired, "[a]t the absolute latest," on July 12, 2022.  [Dkt. No. 217 at p. 20].  Here, whether Hudson's cause of action accrued upon it triggering partial withdrawal on September 30, 2017, or when the Fund assessed Hudson's liability on March 25, 2019, Bowditch's contribution claim, filed on September 23, 2019, falls within a three-year window because on September 23, 2019, M.G.L. c. 260 § 4 would not have barred Hudson from suing Marcum directly.

Insofar as Marcum seems to suggest that in order for a contribution claim to be timely, Hudson must have brought suit against Marcum (rather than Hudson facing no statutory bar to

bringing suit), Marcum fails to support such suggestion with law, and I reject it.  Accordingly, I find that under the statutory three-year limitations period, Bowditch's contribution claim is timely.

### b.  Contractual Time Bar

In support of summary judgment, Marcum also relies on a contractually-shortened one-year limitations period in its 2017 engagement letter.  [Dkt. No. 217 at p. 16 (citing Ex. AA at p. 7)].  Stating that Marcum and Hudson contractually agreed that New York State law would apply to disputes arising from its engagement, Marcum argues that "New York courts have already enforced the … one-year limitations period in a dispute between Marcum and a different client."  [Id.].  Marcum posits that Massachusetts law would render the same result.  [Id. at p. 17].

Under Federal law, "[t]he dominant view ... is that contractual limitations periods shorter than the statute of limitations are permissible, provided they are reasonable."  Alcorn v. Raytheon Co., 175 F. Supp. 2d 117, 121 (D. Mass. 2001); see, e.g., I.V. Servs. of Am., Inc. v. Inn Dev. & Mgt., Inc., 7 F.Supp.2d 79, 86 (D. Mass. 1998), citing Hays v. Mobil Oil Corp., 930 F.2d 96, 100 (1st Cir. 1991) (summary judgment for franchisor allowed based on limitations period in franchise agreement).  "The United States Supreme Court has recognized contracting parties' rights to reduce the period within which they may bring an action to enforce the contract to a shorter period than that set forth in a State's general statute of limitations, provided that there is no controlling statute to the contrary and the shorter period is reasonable."  Creative Playthings Franchising, Corp. v. Reiser, 463 Mass. 758, 763 (2012).  Under New York State law, contractually reduced limitations periods are likewise enforceable when they are found "reasonable, in view of the circumstances of each particular case."  Exec. Plaza, LLC v. Peerless Ins. Co., 22 N.Y.3d 511, 519 (2014).

However, contractually reduced limitations periods can be found "per se invalid and unenforceable" when they set forth an expiration date "regardless of whether the act or omission [underlying a claim] 'could have been discovered with reasonable diligence[]'" before that date. Creative Playthings, 463 Mass. at 764.  In other words, when a contractually shortened limitation period precludes the function of the discovery rule, it is unenforceable.  See Collins v. Nuzzo, 244 F.3d 246, 253 (1st Cir. 2001) ("Under Massachusetts law, the discovery rule suspends the running of the statute of limitations where a cause of action is based on an 'inherently unknowable' wrong; the statute only starts to run when 'the harm becomes known, or in the exercise of reasonable diligence should have become known, to the injured party.'") (internal citation omitted).  Under New York law, contractually reduced limitations period have similarly been found unreasonable and thus unenforceable when, in light of the circumstances, a provided "accrual date" functions to preclude certain claims from being brought altogether.  See Exec. Plaza, LLC, 22 N.Y.3d at 519.

Here, each of the 2012 [Dkt. No. 218-17 at p. 8], 2014 [Dkt. No. 218-19 at p. 8], 2016 [Dkt. No. 218-23 at p. 8], and 2018 engagement letters in the record provide the same one-year limitation period provision: "No action, regardless of form, arising out of the services under this agreement may be brought by either party more than one year after the date of the last services are provided under this agreement."  [Dkt. No. 218-27 at p. 8 (emphasis added)].  The operative engagement letter would have been for the audit of the 2017 financials because withdrawal liability was triggered on September 30, 2017.  According to the record, Marcum delivered its audit report for 2017 on July 29, 2018.  [Dkt. No. 217 at p. 17].  Thus, under the shortened limitations period to which the parties agreed in the engagement letter for 2017, Hudson had until July 29, 2019 to bring suit.  Bowditch did not file its contribution claim until September 23, 2019 (by which date Hudson's ability to sue for the 2017 audit would have been barred).  Accordingly, if I adopted

Marcum's calculation, Bowditch's contribution claim would be time barred.  For the reasons stated below, I do not do so.

In arguing against the reasonableness and hence enforceability of the contractual time bar, Bowditch posits, in part, that as "[n]othing in the language of the agreement permits operation of the discovery rule[,]" the contractual limitations period "operates as a statute of repose and is per se invalid and unenforceable under Massachusetts law."  [Dkt. No. 227 at p. 12 (citing Creative Playthings, 463 Mass. at 764].  Bowditch further contends that applying New York law would have the same result.  While I agree that the language of the contractual time bar is rigid, I disagree that it categorically excludes operation of the discovery rule, and hence operates as a statute of repose.  See McGuinness v. Cotter, 412 Mass. 617, 621-22 (1992) (distinguishing statutes of limitations and statutes of response by noting that the latter "'completely eliminates a cause of action' after the time period established has run without regard to the concept of accrual or of discovery.") (quoting Klein v. Catalano, 386 Mass. 701, 702 (1982)).  First, as a general matter, statutes of limitations implicitly allow for the discovery rule whether or not the discovery rule is expressly mentioned.  See id. at 622 ("[a] limitations period in a statute of limitations generally does not begin to run until the date of the plaintiff's injury or the date that the injury is, or reasonably should have been, discovered.").  Second, Marcum, as a party to the engagement agreements, implicitly acknowledges that the discovery rule was contemplated by the contractual limitation period when it suggests that Bowditch's derivative tort claim would have, at the latest, accrued on March 28, 2019, "when Hudson received actual notice of the partial withdrawal liability."  [Dkt. No. 217 at p. 19].  Applying that accrual date, Marcum notes that the one-year contractual limitations period would have "expired on July 12, 2020 (i.e., one year plus the 106 days of COVID tolling)."  [Id.].  Therefore, because I find that the contractual time bar

contemplates the operation of the discovery rule, I find it is "reasonable" and enforceable under either Massachusetts or New York law.

The operation of the discovery rule implied in the contractual time bar is important here. Marcum asserts that "Hudson should have known that it had triggered a partial withdrawal as of September 30, 2017 … because, by that date, Hudson possessed the correct 70-percent decline formula from Bowditch's April 9, 2009 memorandum and all necessary CBU data to do the calculation." [Dkt. No. 217 at p. 19]. At best, this assertion touches on a contested issue. As suggested in my analysis of the scope of Marcum's duty, the record indicates that on September 30, 2017, Hudson was reasonably relying on the uncorrected spreadsheet and the lack of communication from Bowditch, its ERISA attorneys, and in no position to suspect it had effected a withdrawal. In any case, reading the record in the light most favorable to Bowditch, as I am required to do, the evidence supports the proposition that Hudson did not and could not discover the withdrawal until March 28, 2019, when the Pension Fund notified Hudson of the assessment liability. Thus, assuming arguendo that this contractual one-year limitation period contemplates the discovery rule and is enforceable, if I applied it here, I would find nevertheless that Bowditch's contribution claim filed on September 23, 2019 is timely.

For all these reasons, I deny Marcum's motion for summary judgment on the grounds of the two time bars.

## IV.   CONCLUSION

For the reasons set forth above, the undersigned recommends that Bowditch's Motion [Dkt. No. 219] be DENIED and Marcum's Motion [Dkt. No. 216] be GRANTED.

/s/ David H. Hennessy
David H. Hennessy
United States Magistrate Judge

43